**In re JULIAN SERVICES INDUSTRIES, INC., Debtor.**

**Bankruptcy No. 95 B 26232.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

May 1, 1998.

Roman Sukley, U.S. Trustee's Office, Chicago, IL, for U.S. Trustee.

Kevin M. Brill, Chicago, IL, former counsel for debtor.

John Brosnan, Chicago, IL, for Fenech & Toussaint.

L. Judson Todhunter, Defreese & Fiske, Chicago, IL, for Debtor.

## MEMORANDUM OPINION

RONALD BARLIANT, Bankruptcy Judge.

The United States Trustee filed two motions to examine fees paid to the Debtor's former attorney, Kevin Brill, pursuant to 11 U.S.C. § 329(b). Mr. Brill failed to respond to either of the Trustee's motions after the Court granted him numerous opportunities to do so.[1] Mr. Brill has therefore not denied any allegations against him, or asserted any defense, or requested a hearing of any sort. Moreover, the Trustee's allegations are supported by the record. For the reasons articulated below, the Court grants the Trustee's motions and orders Mr. Brill to turn over to the Debtor's bankruptcy estate the retainer he received from the Debtor in addition to any other payments received in connection with this case.

## BACKGROUND [2]

This case began with the filing of a petition for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101, et seq.[3], in December, 1995. It appeared to be a routine small business case, driven by the need to resolve tax liabilities. Mr. Brill represented the Debtor. The Debtor's motion to employ Mr. Brill disclosed that he received $5,800 as an advance payment retainer on December 6, 1995, before the case was commenced. There is no record of any other payment to Mr. Brill. On the Debtor's behalf, Mr. Brill filed a plan of reorganization on August 6, 1996. After several hearings largely taken up with discussions of how the Debtor would deal with the tax claims, the Court approved a disclosure statement on December 23, 1996, and set a plan confirmation hearing for February 18, 1997. The United States filed an objection to the plan on behalf of the Internal Revenue Service.

At the February 18th hearing, Mr. Brill made the following representations:

> There's two ballots that have been received on this case. The ballot from [ ] Fenech Toussaint, P.C., rejecting the plan in the unsecured creditor amount of $69,517.59. I would point out that Fenech Toussaint did not file a claim in this matter, and that there was a further ballot filed February 11th from KBS Service Industry in the amount of $89,000 and some change accepting the plan, $89,523, Your Honor, a majority, which I believe the plan meets the requisite code requirements as to being confirmed with those ballots.[4]

(Tr. Feb. 18, 1997 at 2.)

Mr. Brill then began a lengthy discussion of the IRS matter. The attorney for the IRS

---

1. The Trustee filed his motion to examine fees on December 11, 1997. On December 17, 1997, the Court granted Brill leave to file an answer to the Trustee's motion on or before January 9, 1998. On January 9, 1998, Brill filed a motion for an extension of time to respond to the Trustee's motion. On January 14, 1998, the Court granted Brill's motion and extended the time for filing an answer to the Trustee's motion to February 11, 1998. On February 12, 1998, the Trustee filed his motion for entry of an order granting his previously filed motion and on February 17, 1998, the Court granted Brill leave to file an answer to Trustee's second motion on or before February 24, 1998.

2. The Court bases its findings of facts contained in the background section of this opinion on the numerous hearings it presided over in this case. These facts are undisputed; they are alleged in the Trustee's motions to which Brill failed to respond.

3. All further statutory references refer to Title 11 of the United States Code.

4. Mr. Brill later corrected the amount of the KBS claim to $85,167.79. Also, the correct name of the creditor is KBS Partners.

responded to those comments and then stated, "I have no objection to confirmation going forward." (Tr. Feb. 18, 1997 at 7.) After further discussion about the tax matter, the parties and the Court agreed that the matter should be continued for a short time to determine whether the IRS could agree to the tax-related provisions of the plan. Nobody returned to the question of plan acceptance. Neither the Court nor the parties questioned what Mr. Brill meant when he said that "Fenech Toussiant did not file a claim," or how he arrived at the conclusion that "the plan meets the requisite code requirements as to being confirmed with those ballots."

At the continued confirmation hearing on March 5, 1997, Mr. Brill essentially repeated that report. He again immediately turned to the tax issue and represented that the IRS had agreed with the Debtor's position as stated in an addenda to the disclosure statement.[5] The attorney for the IRS was not present, and the Court indicated it would confirm the plan. Before an order was entered, however, the IRS's attorney appeared and the clerk recalled the matter. The attorney for the IRS reported that, in fact, there was no agreement. There then followed a long, complex discussion about whether there had been an agreement expressed at a prior hearing (the Court found that there had been no agreement then either) and about the underlying tax issues. Nobody said any more about the ballots.

Finally, Mr. Brill agreed to the IRS's position, rather than have a full hearing on the issue, and the Court authorized him to prepare an order deleting the plan provision to which the IRS had objected and otherwise confirming the plan. Such an order was entered on April 15, 1997. It appeared that, although Mr. Brill had failed to get the tax treatment he wanted, he had succeeded in confirming a plan of reorganization that would allow his client to continue in business.

Mr. Brill's apparent success began to unravel on July 8, 1997, when Fenech & Toussaint, P.C. presented a motion to compel the Debtor to make payments under the plan. It alleged that it had not been paid although it was a creditor that had been listed in the Debtor's schedules as holding a $75,000 claim not scheduled as disputed, contingent, or unliquidated. Section 1111(a) provides that, "[a] proof of claim or interest is deemed filed under section 501 of this title for any claim or interest that appears in the schedules filed under section 521(1) or 1106(a)(2) of this title, except a claim or interest that is scheduled as disputed, contingent, or unliquidated." § 1111(a). And the plan itself defined "allowed claim" to include "a claim ... that has been listed by the debtor in its Schedules of liabilities as other than disputed, contingent or unliquidated...." (Debtor's Plan, Art. I, § A.2.) Therefore, the creditor argued, it held an allowed claim and should have been paid $7,500 in accordance with the plan.

Mr. Brill opposed this motion. He argued (notwithstanding both § 1111(a) and the definition of "allowed claim" in the plan he drafted) that only creditors who had actually filed proofs of claim were entitled to payment. He based this argument on a provision in the plan that said:

> On the Effective Date, or as soon thereafter as may be practicable, each holder of an Allowed Class 5 Claim [i.e., an unsecured creditor] will receive cash equal to 5% of the allowed claim of such Class 5 Claim [and an additional 5% 90 days later]. *Claimants who do not file a proof of claim prior to the bar date established by order of this Court will be barred from this distribution and all subsequent distributions under this plan ....*

(Debtor's Plan, Art. VI, § E (emphasis added).)

The Court granted Fenech & Toussaint's motion over Mr. Brill's objection[6] and or-

---

5. After reporting that he and the IRS's attorney, Mr. Silber, had a "long discussion" a few days earlier, Mr. Brill said, "I can refer [sic] to the court that Mr. Silber stated to me that he agreed with the addenda as written." (Tr. Mar. 5, 1997 at 2–3.) When it was later determined that Mr. Brill's representation had been incorrect, he apologized. (Tr. Mar. 5, 1997 at 18).

6. Mr. Brill's argument overleaped the mere frivolous into the category of the patently absurd. Section 1111(a) states that "a proof of claim is *deemed filed* ... for any claim ... that appears in the schedules" and is not disputed, contingent or unliquidated. A creditor that holds such a claim is treated as having filed a proof of claim for all purposes by operation of law. Therefore, such a

dered payment to it and all similarly situated creditors.[7] But that, it turned out, was only the beginning. Neither the Court nor the attorney for the United States Trustee (who appeared at the July 8, 1997 hearing) recalled that Fenech & Toussaint was the creditor that Mr. Brill reported at the confirmation hearing had rejected the plan but "did not file a claim in this matter." At the July 8, 1997 hearing, Fenech & Toussaint's attorney said he had been unable to find a ballot report in the court file. Such a report is required by Local Bankruptcy Rule 1101. Mr. Brill responded to these inquiries by stating, "We had a ballot report." (Tr. July 8, 1997 at 12.) The Trustee's attorney recalled that a report had been handed up, but not filed. Mr. Brill replied, "It was done." (Tr. July 8, 1997 at 12.) The creditor's attorney asked for "an order that the ballot report be filed so I have an opportunity to take a look at it and make sure the plan was properly confirmed it begin with." (Tr. July 8, 1997 at 12.) To this, Mr. Brill reacted with righteous indignation:

> Mr. Brill: Judge, you know, this is too far afield. The time for the confirmation of this plan has run. There's no revocation of it that's possible absent fraud. There was absolutely no fraud. This plan was confirmed months and months and months ago. There is no—
>
> The Court: Well, the ballot report should be in the file no matter what.
>
> Mr. Brill: And it was filed and it was approved. And his client voted no on the plan. An that was properly reported even though there was other sums in excess of that.

(Tr. July 8, 1997 at 12–13.)

Notwithstanding Mr. Brill's vigorous objection, the Court entered an order on July 9, 1997, requiring the Debtor to "immediately"

file the report. It was not immediately filed. After being reminded at an intervening status hearing, Mr. Brill produced a ballot report in court on September 23, 1997. In its relevant part, the report stated as follows:

2. *Summary of Voting and Results*

1. The only class which voted in Julian Service Industries, Inc.'s, balloting was Class 5, comprised of the unsecured creditors.

Members of Class 5 cast four ballots, representing $187,160.38.

Of the four ballots cast, three accepted the plan for a total amount of $117,642.79. One rejected the plan, representing a total amount of $69,517.59.

The following represents the ballot returns:

| Accepted: | |
|---|---|
| Chatham Rug Co. | $ 5,775.00 |
| KBS Partners | 85,167.79 |
| KBS Partners | 26,700.00 |
| Total Accepted | $117,642.79 |

| Rejected: | |
|---|---|
| Fenech & Toussaint | $ 69,517.59 |
| Total Rejected | $ 69,517.59 |

3. Acceptance and Confirmation. The Plan was accepted by the only impaired class. The plan was confirmed.

4. Ballots counted.

All ballots which were returned have been counted.

(Debtor's Ballot Report, at 2.)

The Court and the parties quickly calculated that according to the numbers in that report, the plan had not received the required vote of Class 5 creditors "that hold at least two-thirds in amount" of the claims of creditors who accepted or rejected the plan. § 1126(c). The Court *sua sponte* vacated the order of confirmation.[8] Relying on § 105(a),

---

creditor *has* filed a proof of claim as of the date the schedules were filed and is entitled to payment under the very provision upon which Mr. Brill relied.

7. According to Fenech & Toussaint's attorney, only four of 20 scheduled creditors filed proofs of claim.

8. At the September 23rd hearing, Mr. Brill said, consistent with his prior assurance that a report

had been timely filed, "I believe that I handed this [i.e., the ballot report] out back then [i.e., the date of the confirmation hearing], but it's not in the file. So maybe I handed it up and it got handed back to me and I didn't file it. But this is the amount that was reported at the time on this matter." (Tr. Sept. 23, 1997 at 4.) First, there is no indication in the relevant transcripts that any ballot report was handed to the Court on either of the two days confirmation was be-

the Court found that confirmation had been obtained by a misrepresentation to the Court that the plan had been accepted by all impaired classes. That finding was based on the ballot report itself.

A review of the case file discloses additional troubling facts that were unknown to the Court on September 23rd. According to the ballot report, KBS Partners filed two acceptances of the plan, one representing a claim of $85,167.79, the other, $26,700. The file reveals that KBS Partners did file a proof of claim in the amount of $85,167.79 "plus costs and atty. fees." The file also reveals, however, that Mr. Brill filed an objection to that claim on January 8, 1997. On the same date, Mr. Brill filed a "Motion to Approve Settlement with KBS Partners," which he presented to the Court on January 15, 1997. That motion recited the following terms of settlement, supported by the allegation that "the cost of litigation would exceed the cost to the estate of the proposed settlement." (Debtor's Mot. to Approve Settlement, at 1.)

The motion stated that Debtor and KBS Partners agreed to settle the claim as follows:

(a) The claim of $85,167.69 plus attorney's fees and costs has been settled for the amount of $26,700 in total satisfaction of the claim, with said amount to be paid as detailed below in paragraph (b).

(b) The total claim is $105,000 (inclusive of costs), but KBS has agreed to settle its

entire claim in return for payment as follows:

(I) $16,700 to be paid by the Debtor upon an order approving the settlement, and becoming final.

(ii) $10,000 to be paid by Thomas Julian, upon the order approving settlement becoming final.

(Debtor's Mot. to Approve Settlement, at 1.)

On January 15, 1997, the Court approved the settlement "on the terms and conditions stated in the motion." On February 11, 1997, KBS partners filed its two accepting ballots in the amounts of the $85,167.79 original claim and the $26,700 settlement of that claim.

Based on this record, however, KBS Partners was not entitled to accept or reject the plan at all. Only holders of allowed prepetition claims may accept or reject a plan. § 1126(a).[9] A proof of claim is deemed allowed unless a party in interest objects to it. § 502(a). Once an objection is filed, the Court must determine the allowed amount. § 502(b). In this case, the Debtor objected to the $85,167.79 KBS Partners claim so it was not deemed allowed. The Court's order that resolved that objection approved a settlement in the amounts of $16,700 payable by the estate and $10,000 payable by the Debtor's principal, all to be paid in full when that order became final. Upon the entry of that order, KBS Partners had, at most, a right to payment of an administrative expense in the amount of $16,700.[10] If the payment was made ten days later, when the order became

fore the Court. Second, the amounts in the report are not the amounts reported at the confirmation hearing. Third, the report says, "The plan *was* confirmed." That statement would not have been made in a report prepared before confirmation. The Court finds that no such report was filed or "handed up" before September 23, 1997.

9. Section 1126(a) restricts the franchise to holders of claims allowed under § 502. That section refers to § 501, which authorizes creditors to file proofs of claim. The word "creditor" is defined as the holder of a pre-petition claim and certain other claims, not relevant here. § 101(10) Therefore, only holders of claims that arose prepetition may accept or reject chapter 11 plans.

10. This settlement raises more questions. The Debtor's plan paid unsecured creditors only 10% of their allowed claims in two equal installments. If Mr. Brill had not objected to the KBS Partners

claim, it would have been allowed in the amount of $85,167.79. The Debtor would then have paid only $8,516.78 over time. Even accepting the Debtor's estimate that the claim including costs would have come to $105,000 (KBS Partners never amended its claim to add the costs), the plan payment would still have been only $10,500. Instead, the Debtor agreed to pay $16,700 in cash immediately, without regard to confirmation of the plan. And the Debtor's principal agreed to pay an additional $10,000.

When questioned about the KBS Partners matter at the October 7, 1997 hearing, Mr. Brill explained that the generous settlement was motivated by a desire to resolve a claim KBS Partners was asserting against the Debtor's principal. So the Debtor, under Mr. Brill's guidance, agreed to better terms with a creditor that had a claim against its principal than it was offering to other creditors. When asked how KBS Partners could have voted on the plan, Mr. Brill responded only

final and the payment was due, it had no claim at all. It certainly had no pre-petition claim, and therefore no right to accept the plan.

At the February 18, 1997 confirmation hearing, Mr. Brill reported only the ballot in the amount of $85,167.79. Mr. Brill said nothing about the settlement that had been approved a month earlier. Just as the Court and parties unquestioningly accepted Mr. Brill's representation that Fenech & Toussiant had not filed a claim, we similarly assumed without question that KBS Partners was a creditor entitled to accept or reject the plan.

After the Court revoked confirmation on September 23rd, Mr. Brill filed a motion to "reconfirm" the plan, which he scheduled for hearing on October 7, 1997. The motion did not dispute the important facts as stated above, but only argued that the Court had no authority to revoke confirmation. Before Mr. Brill appeared to present that motion he learned that his client had retained other counsel. The Court quickly granted Mr. Brill's oral request for leave to withdraw his appearance. The Debtor, by its new counsel, abandoned the motion to "reconfirm" and is proceeding with a new proposed plan.

## DISCUSSION

Section 329(b) provides, in pertinent part, that if compensation paid to a debtor's attorney "exceeds the reasonable value of any services, the court may ... order the return of any such payment, to the extent excessive." § 329(b). As the Seventh Circuit recently explained:

> Section 329(b) authorizes the [bankruptcy] court to assess the reasonable value of the services counsel provided to the debtor and to compare that value with the amount the debtor paid or agreed to pay for the attorney's services.... Once a question has been raised about the reasonableness of the attorney's fee under section 329, it is the attorney himself who bears the burden of establishing that the fee is reasonable.

*Matter of Geraci*, 138 F.3d 314, 318 (7th Cir.1998). In addition, the Court must look to § 330 when determining the reasonableness of fees charged. *See Id.* at 318; *Matter of Wiredyne, Inc.*, 3 F.3d 1125, 1128 (7th Cir.1993). Under § 330(3)(A), the Court "shall consider the nature, the extent, and the value of" the debtor's attorney's services. § 330(3)(A).

Mr. Brill has obviously failed to carry his burden of establishing that the fees he received in this case were reasonable because he failed to respond to the Trustee's Motions. Moreover, an independent examination of the facts of the case, which overlooks Mr. Brill's failure to respond, leads the Court to conclude that the fees he received in this case were excessive and must be returned to the estate.

As the record makes clear, Mr. Brill engaged in a series of unethical acts before the Court. He repeatedly misrepresented key facts to the Court and interested parties. Ultimately, the work he performed on behalf of the Debtor was rendered useless by the Debtor's need to hire a new attorney and formulate a new plan. In addition, the settlement Mr. Brill procured with KBS Partners resulted in the Debtor paying more than it would have under its proposed plan(see footnote 10, above) and evidences a lack of concern for ethical and legal requirements. Hence, the value of Mr. Brill's services is nonexistent. Indeed, Mr. Brill's services fall so short of what an attorney entitled to compensation renders that it is difficult to evaluate his work under many of the factors listed in § 330(a)(3)(A).[11] For instance, the amount of time Mr. Brill spent performing the work is irrelevant because the work performed was of such low caliber. In the end, his services actually hurt the Debtor and certainly do not entitle him to any compensation.

## CONCLUSION

The United States Trustee's motions to examine fees paid to attorney pursuant to 11 U.S.C. § 329(b) and for entry of an order

---

that part of the deal was that it would support the plan.

This Court will leave it to the reader to sort through the issues Mr. Brill's answers raise.

**11.** This is also true of the factors stated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), which are often discussed in cases reviewing the reasonableness of fees. *See, e.g., In re Singa*, 1997 WL 400724 at *4 (Bankr. N.D.Ill. June 9, 1997).

granting his motion to examine fees paid to attorney pursuant to 11 U.S.C. § 329(b) are granted for the reasons stated above. Kevin Brill is ordered to immediately turnover any fees, including the retainer paid by the Debtor, he received in this case to the bankruptcy estate.

### ORDER

For the reasons set forth in the Memorandum Opinion of even date herewith, **IT IS HEREBY ORDERED** that the United States Trustee's motions to examine fees paid to attorney Kevin Brill pursuant to 11 U.S.C. § 329(b) and for entry of an order granting his motion to examine fees paid to attorney Kevin Brill pursuant to 11 U.S.C. § 329(b) are granted.

**IT IS FURTHER ORDERED** that Kevin Brill immediately turnover any fees he received in connection with this case including, but not limited to, the $5,800 retainer he received on December 6, 1996, to L. Judson Todhunter, attorney for the debtor-in-possession.